UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTEN SCHOFIELD,

    Plaintiff,

v.                           Case No. 8:19-cv-3097-VMC-TGW

GOLD CLUB TAMPA, INC.,
MICHAEL TOMKOVICH,
DOE MANGERS 1-3 and
DOES 4-100,

    Defendants.

_____/

### ORDER

    This matter comes before the Court upon consideration of Plaintiff Kristen Schofield's Motion for Partial Summary Judgment, filed on January 4, 2021. (Doc. # 55). Defendants Gold Club Tampa, Inc. and Michael Tomkovich responded on January 19, 2021. (Doc. # 56). Schofield replied on February 1, 2021. (Doc. # 60). For the reasons that follow, the Motion is granted.

### I.  Background

#### A.  Gold Club General Operations

    Defendant Gold Club Tampa, Inc. operates a restaurant and adult entertainment club in Tampa, Florida. (Doc. # 55-6 at 11:11-12:5, 85:13-24). Defendant Michael Tomkovich is the current owner of Gold Club. (Id.).

In addition to serving food and drinks, Gold Club provides adult entertainment in the form of exotic dancers. (Id. at 59:13-18). The main area of the two-story club boasts a stage, and during any given shift a house DJ plays music while dancers perform on the stage. (Id. at 34:3-10, 36:13-14, 83:9-11; Doc. # 55-5 at 40:2-41:11).

The DJ uses a list of dancers present at the club to "set[] up some sort of a rotation." (Doc. # 55-5 at 40:19-41:11). Over the course of the night, "the DJ goes down the list calling out names of dancers to dance on stage." (Doc. # 55-6 at 35:4-9). Dancers "tell the DJs what songs they want to listen to," and when their names are called "they dance to those songs they picked out." (Id. at 35:12-13). The DJ plays each song for roughly two and a half minutes before calling the next dancer. (Doc. # 55-5 at 41:12-23).

A dancer is not required to dance on stage when her name is called, and some dancers choose to never go on stage. (Doc. # 55-6 at 34:11-20, 35:24-25). However, "most of [the dancers] like to [go on stage] because that's where they get the bulk of their tip money, and that's how they meet a customer, and that's how they end up taking them back and doing a VIP dance." (Id. at 34:17-20). If a dancer does not go on stage

when she is called, the DJ "skip[s] them and go[es] to the next one." (Id. at 35:2-3).

In addition to watching dancers on stage, a patron may purchase a VIP dance. A VIP dance is a single lap dance to one song, performed "in big open booths." (Id. at 65:4-7). Gold Club also offers several private VIP or champagne rooms. (Id. at 25:13). Patrons may purchase time with a dancer in a champagne room in fifteen-minute increments, up to the whole night. (Id. at 30:11-23; Doc. # 55-5 at 43:25-44:6).

To purchase VIP dances or time in a champagne room, a customer must "go back and talk to the VIP host." (Doc. # 55-5 at 45:2-5). The VIP host collects the money, "rings it in, asks how many dances you're going to do . . . and charges accordingly." (Doc. # 55-6 at 47:8-12).

VIP hosts, who are paid hourly wages by Gold Club, ensure a customer has paid before any scheduled dance goes forward. (Id. at 67:3-12; Doc. # 55-5 at 45:13-16). Even if a customer gives the money directly to a dancer, the dancer will "get [the money] from the customer, [and] hand it to the VIP host." (Doc. # 55-6 at 47:13-18).

VIP hosts are also, "for lack of a better term, the dance tracker[s]." (Doc. # 55-5 at 43:10-11). Throughout the night, VIP hosts "watch[] how many dances are being done and mak[e]

3

sure the customer isn't assaulting the dancer." (Id. at 57:15-58:16; Doc. # 55-6 at 61:21-22). The VIP host writes down each dancers' VIP dances and champagne room time on a "VIP sheet." (Doc. # 55-6 at 61:3-62:5).

Every night, the VIP host tallies the number of dances on the VIP sheet to "double-check" the club's income. (Doc. # 55-5 at 57:15-58:16). Gold Club charges customers a $5 fee per song for each VIP dance purchased (Id. at 43:7-8; Doc. # 55-6 at 37:10-12) and a base fee to use each champagne room. (Doc. # 55-6 at 25:22-26:3, 62:9-63:3; Doc. # 55-5 at 44:5-45:16). The dancer's fee, which she negotiates with the customer, is in addition to these base fees. (Doc. # 55-6 at 25:22-26:3, 30:6-10, 32:7-13). At the end of the night, the VIP host "gives the entertainer back [her portion of the money] and keeps [the club's portion]." (Id. at 37:10-12; Doc. # 55-5 at 43:7-16). Dancers sign out at the end of the night and "indicate the amount of income that she made and the hours she was there." (Doc. # 55-5 at 27:12-19, 55:5-7).

Dancers keep whatever tips they make on stage, in VIP dances, or in champagne rooms. (Doc. # 55-6 at 25:22-25). Gold Club does not pay dancers any hourly wages or give dancers any form of a paycheck. (Doc. # 55-5 at 23:9-20). All

money earned by dancers comes from tips or customers purchasing dances. (<u>Id.</u> at 28:9-29:1).

### B. <u>Gold Club Dancer Policies</u>

In order to perform at Gold Club, a dancer must "produce valid identification", "[a]nswer some generic questions as far as if she's performed anywhere else or [] performed before," and "[go] through kind of an audition process as far as getting on stage to see how she handles herself in terms of making eye contact, engaging with the guests." (<u>Id.</u> at 38:25-39:10). Once "that is over and done with, then the determination is made as to whether or not [Gold Club will] go ahead and lease her space." (<u>Id.</u> at 39:11-13). "Typically the manager on duty" decides whether Gold Club leases the space or not. (<u>Id.</u> at 39:15, 49:2-9).

After Gold Club determines a dancer may perform, she signs a "performance agreement/lease agreement." (Doc. # 55-6 at 43:3-6). The agreement states that the "relationship of the parties hereto is that of The Business as 'Licensor' and 'Lessor' and Performer is a Licensee and Temporary Space Lessee and no employee/employer relationship exists between the Business and Performer." (Doc. # 55-4 at 4).

To perform at the club on any given night, dancers must pay a "lease fee." (Doc. # 55-5 at 36:2-37:18). The lease fee

begins at $10 if the dancers arrive before 7:00PM and goes up to $20 if dancers arrive after 7:00PM. (Id.). Gold Club does not fine dancers for leaving early, taking breaks, or failing to come to the club and perform. (Id. at 37:21-22; Doc. # 55-6 at 103:16-21).

While performing, Gold Club does not require dancers to abide by any written employee rules, policies, or procedures, other than the laws and regulations mandated by the State of Florida and the City of Tampa. (Doc. # 55-6 at 79:22-80:4). Gold Club does not regulate the outfits that the performers wear. (Id. at 81:20-23). Performers do not have set schedules, they can arrive when they wish and work for as long or as little as they wish during operating hours. (Id. at 13:1-2, 60:14-15, 78:16-22). These hours are from 12:00PM to 3:00AM on weekdays and 3:00PM to 3:00AM on weeknights. (Id. at 39:16-40:6). Even if a customer is willing to spend money and stay past 3:00AM, the club closes at 3:00AM. (Id.).

C.   **Instant Action**

On December 17, 2019, former dancer Steffanie A. filed the instant action against Gold Club, Tomkovich, and various Doe managers (collectively, Defendants) alleging violations of the Fair Labor Standards Act (FLSA). (Doc. # 1). Plaintiff Kristen Schofield filed her notice of consent to join the

6

litigation on January 20, 2020. (Doc. # 12). Schofield danced at Gold Club from at least January 2018 to February 2019. (Doc. # 55-2 at ¶ 3).

On February 6, 2020, this Court granted Defendants' motion to compel arbitration as to Steffanie A. (Doc. ## 11, 19). The Court found that Steffanie A. had signed a binding arbitration agreement with Gold Club and directed her to submit her claims to arbitration in accordance with that agreement. (Doc. # 19). The Court also stayed the proceedings with respect to Steffanie A. (Id.).

Defendants thereafter filed a motion to compel arbitration as to Schofield, attaching an identical arbitration agreement. (Doc. ## 20, 20-1). Schofield did not file a response in opposition, thus the Court granted the motion as unopposed. (Doc. # 23). Schofield was directed to submit her claims to arbitration and the case was stayed as to her on February 24, 2020. (Id.).

On June 9, 2020, Schofield filed a motion to vacate the Court's order compelling arbitration. (Doc. # 26). Schofield explained that she attempted to submit her claims to arbitration with the American Arbitration Association (AAA), but Defendants failed to pay their share of the arbitration fee. (Id.).

The Court granted Schofield's motion, finding that Defendants' failure to pay the AAA the necessary fees was a default in contravention of the arbitration agreement. (Doc. # 31). Accordingly, the Court vacated its prior order (Doc. # 23) and lifted the stay of the case as to Schofield.

Schofield now moves for partial summary judgment. (Doc. # 55). Schofield requests the Court find as a matter of law that she was misclassified as an independent contractor, that she was Gold Club's employee, and that she is thus entitled to an employee's protections under the FLSA. (Id. at 18). Gold Club has responded (Doc. # 56), Schofield has replied (Doc. # 60), and the Motion is ripe for review.

## II.  **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving

party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference

9

from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

The FLSA defines "employee" broadly as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Whether a plaintiff is an employee under the FLSA is a question of law for the court. Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). To determine whether an employer-employee relationship exists, "courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013). True, Schofield signed an agreement designating her a "licensee" and stating there was "no employee/employer relationship" between herself and Gold Club. (Doc. # 55-4 at 4). However, the label attached to a relationship is dispositive only to the degree that it mirrors

economic reality. <u>Harrell v. Diamond A Entm't, Inc.</u>, 992 F. Supp. 1343, 1353 (M.D. Fla. 1997) (citation omitted).

In determining the economic reality of the relationship, courts consider the following factors: (1) the nature and degree of control over the alleged employee; (2) the alleged employee's opportunity for profit or loss; (3) the alleged employee's investment in equipment or materials; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. <u>Scantland</u>, 721 F.3d at 1311–12. No single factor is dispositive, and the list is not exhaustive. <u>Id.</u> at 1312 n.2 (citing <u>Santelices v. Cable Wiring</u>, 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001)).

Defendants argue that Schofield was not an employee, but a "licensee allowed to utilize the entirety of the Club premises to entertain the Club's patrons." (Doc. # 56 at 1-2). For support, Defendants rely on two cases from other circuits holding that exotic dancers were not employees under the FLSA. (<u>Id.</u>) (citing <u>Hilborn v. Prime Time Club, Inc.</u>, 2012 WL 9187581 (E.D. Ark. July 12, 2012); <u>Matson v. 7455, Inc.</u>, 2000 WL 1132110 (D. Or. Jan. 14, 2000)).

In contrast, Schofield cites a multitude of analogous cases in which exotic dancers were held to be employees as a matter of law. (Doc. # 55 at 9-11). The Third, Fourth, and Fifth Circuits have all found dancers to be employees of the clubs in which they performed. See Reich v. Circle C. Investments, Inc., 998 F.2d 324, 329 (5th Cir. 1993) ("We reject the defendants' creative argument that the dancers are mere tenants who rent stages, lights, dressing rooms, and music from Circle C."); McFeeley v. Jackson St. Entm't, LLC, 825 F.3d 235, 244 (4th Cir. 2016) ("Considering all six factors together, particularly the defendants' high degree of control over the dancers, the totality of circumstances speak clearly to an employer-employee relationship."); Verma v. 3001 Castor, Inc., 937 F.3d 221, 232 (3d Cir. 2019) ("[W]e easily conclude the dancers were dependent upon the business to which they render service. They were not, as a matter of economic reality, operating independent businesses for themselves." (internal citation and quotations omitted)).

Although the Eleventh Circuit has not ruled on this question, several district courts have issued comparable opinions. See, e.g., Shaw v. Set Enterprises, Inc., 241 F. Supp. 3d 1318, 1323-24 (S.D. Fla. 2017) (listing cases). District courts in the Eleventh Circuit have uniformly found

exotic dancers to be employees of the clubs in which they perform. Id.

Although Defendants attempt to distinguish their case from these cases, the facts in the record do not support a different result. For the reasons below, the Court agrees with the greater weight of authority and concludes that Schofield was an employee of Gold Club under the FLSA.

**A.   Control**

The first factor in the economic reality test is "the nature and degree of the alleged employer's control as to the manner in which the work is to be performed." Scantland, 721 F.3d at 1312. "Courts considering the status of exotic dancers under the FLSA generally look not only to the guidelines set by the club regarding the entertainers' performances and behavior, but also to the club's control over the atmosphere and clientele." Butler v. PP & G, Inc., No. CIV.A. WMN-13-430, 2013 WL 5964476, at *3 (D. Md. Nov. 7, 2013).

Gold Club argues that Schofield exercised significant control over most aspects of her work. Specifically, Schofield set her own schedule, decided whether to dance on the stage or pursue more lucrative private dances, chose her own choreography, costume, and music, and determined for which customers she danced. (Doc. # 56 at 7).

13

The "mere fact that [Gold Club] has delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the status of independent contractors. Indeed, one could say that the nature of a dancer's job requires some measure of discretion and flexibility." Harrell, 992 F. Supp. at 1349. Schofield may have had some "freedom to work when she want[ed] and for whomever she want[ed]," but this Court must determine whether that discretion "merely mask[ed] the economic reality of dependence." Martin v. Priba Corp., No. CIV.A.3:91-CV-2786-G, 1992 WL 486911, at *3 (N.D. Tex. Nov. 6, 1992) (citation omitted); see also Mednick v. Albert Enterprises, Inc., 508 F.2d 297, 302 (5th Cir. 1975) (holding that an employer cannot "reliev[e] itself of its duties under the [FLSA] by granting [a worker] some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have [her] operate").

Like other courts examining the employment status of dancers, this Court concludes that Schofield did not exert control over any "'meaningful' part of [Gold Club's] business." Harrell, 992 F. Supp. at 1349. On the contrary, the record indicates Gold Club exercised significant control over Schofield while she danced.

First, dancers had to sign in when arriving at Gold Club and pay an escalating lease fee based on time of arrival. (Doc. # 55-5 at 27:12-19, 36:13-38:20, 55:5-7). Dancers also signed out at the end of the night and informed Gold Club how much income they made and how many hours they worked. (Id.). Other courts have found similar requirements to indicate control. See McFeeley v. Jackson St. Entm't, LLC, 47 F. Supp. 3d 260, 268 (D. Md. 2014), aff'd, 825 F.3d 235 (finding that one example of a club exerting significant control was requiring dancers to sign in upon arrival); Shaw, 241 F. Supp. 3d at 1325 (finding an escalating house fee and sign-in requirement to lean in favor of control).

Second, Gold Club employees tracked the income generated by each dancer and handled much of the money a dancer earned throughout the night. (Doc. # 55-6 at 46:23-25). Although dancers could collect tips directly, customers had to pay VIP hosts before a more expensive VIP or champagne room dance could occur. (Id. at 22:20-23:8, 47:8-18; Doc. # 55-5 at 43:5-16, 45:1-16). VIP hosts, not dancers, ensured payment was satisfied. (Doc. # 55-5 at 45:13-16). If a dispute with a customer arose, dancers relied on either VIP hosts or management to resolve the dispute. (Id. at 48:6-10). Only at the end of the night, after the VIP hosts subtracted Gold

Club's cut, were dancers returned their money. (Id. at 43:7-16, 57:15-58:16; Doc. # 55-6 at 37:10-12, 22:8-23:8).

Even if this practice was not codified in writing, the informal policy stripped dancers of control over their earnings for the night, indicating an employer-employee relationship with the club. See Degidio v. Crazy Horse Saloon & Rest., Inc., No. 4:13-CV-02136-BHH, 2015 WL 5834280, at *3 (D.S.C. Sept. 30, 2015) (finding exotic dancers to be employees of a club despite the club characterizing its policies as unwritten "custom" because the "bottom line is that the defendant employs practices that are very similar to the 'rules' imposed at other clubs").

Third, as in several other cases where dancers were found to be employees under the FLSA, Gold Club exercised complete control over the flow of customers into the club. Gold Club not only had total discretion over its advertising and the branding of the club (Doc. # 55-6 at 74:22-75:23), it had sole determination over which patrons could enter the club. (Id. at 100:1-15; Doc. # 55-5 at 35:13-17). Schofield thus had no control over the "visibility or quality" of the club and was "entirely dependent on [Defendants] to provide her with customers." Butler, 2013 WL 5964476, at *4.

Other courts have found dancers to be employees where they had "no control over the customer volume." Harrell, 992 F. Supp at 1350; see also Butler, 2013 WL 5964476, at *4. Schofield may have had discretion over whom she approached within Gold Club, but her pool of customers was strictly limited to the individuals that Defendants drew to the club via advertising, then granted admission at the front door. Such reliance weighs in favor of economic dependence. See Butler, 2013 WL 5964476, at *4 (holding that the first factor "likely tips in favor of economic dependence, as Defendant exclusively controls the flow of customers, on which Plaintiff depended for her income").

Schofield was entirely dependent on Gold Club to maintain and operate the club. Gold Club owned the land where the club was located, purchased all supplies like the stage, poles, lights, and audio equipment, was responsible for maintenance, cleaning, and upkeep of the facilities, paid all salaries for waitstaff, bartenders, DJs, and VIP hosts, and took care of all utilities like insurance, electricity, and water. (Doc. # 55-5 at 61:6-62:16; Doc. # 55-6 at 83:7-84:5, 107:18-108:12, 67:3-9, 68:12-69:13). Dancers could only work within the business hours set by Gold Club, even if a customer

wanted to stay later. (Doc. # 55-5 at 51:5-52:3; Doc. # 55-6 at 39:16-40:6).

Other courts have held that even where a club did not exercise control "over the day-to-day decisions and work of its dancers," it still exercised "significant control over the dancers by way of controlling the overall atmosphere of the club through advertising, setting business hours, maintaining the facility, and maintaining aesthetics." Butler, 2013 WL 5964476, at *4. Schofield's economic status was "inextricably linked" to conditions over which Gold Club had complete control, like advertising, customer flow, overall club atmosphere, and facilities maintenance. Reich v. Priba Corp., 890 F. Supp. 586, 592 (N.D. Tex. 1995). Such a dynamic indicates economic dependence. Id.

The Court is not persuaded by Gold Club's argument that Schofield set her own schedule, or that Gold Club enforced few, if any, employment policies. (Doc. # 56 at 10). Other courts have found dancers to be employees despite flexible schedules and few formalized rules.

For example, in Butler, the defendant did not create work schedules, did not mandate that the entertainers dance or dress a certain way, allowed each dancer to set her own fees, and set behavioral guidelines requiring only that the

18

dancers follow applicable laws. 2013 WL 5964476, at *3. Nonetheless, the court held that the club exercised significant control because it alone was responsible for "the advertising, location, business hours, maintenance of facility, aesthetics, and inventory of beverages," and therefore "the atmosphere, clientele, and operation of the club." Id. at *4.

The Court finds the same logic applicable here. "Although [Schofield] could choose [her] shifts, clients, and which dances to perform, such discretion is typical for an exotic dancer and does not, without more, establish that [Schofield] [was an] independent agent[]." See Shaw, 241 F. Supp. 3d at 1325 (finding dancers to be employees where they "had virtually no control over the customer volume, hours, food and drink, or overall atmosphere at the Clubs").

The Court is similarly unpersuaded by Gold Club's argument that dancers could negotiate their own prices. (Doc. # 56 at 13). According to Gold Club, it charged customers a base rate for the champagne rooms and a $5 fee for VIP dances, but the dancers were free to charge "whatever they want[ed]" on top of that. (Doc. # 56 at 14; Doc. #55-5 at 42:12; Doc. # 55-6 at 32:7-13).

Even if this were the case, courts examining comparable pricing arrangements have still found the dancers to be employees. The club in Degidio had a similar pricing strategy and made virtually the same argument at summary judgment as Gold Club. 2015 WL 5834280, at *2. The court in that case held that whether the club "characterized [the price of a dance] as a minimum price or a recommended price, the bottom line is that the Club influence[d] the pricing of the various performances offered." Id. at *9.

Likewise, in the instant case it is undisputed that Gold Club charged a fee of $5 for each VIP dance and set a base rate for each champagne room. (Doc. # 55-5 at 28:17-18, 42:1-25, 45:2-16; Doc. # 55-6 at 25:14-26:9, 62:9-18). Dancers were aware of these rates because management "explain[ed] [the rates] to [dancers] during the audition process and lease process." (Doc. # 55-5 at 42:8-25, 45:2-12, 53:25-54:8; Doc. # 55-6 at 28:21-10). Whether the dancers could negotiate higher prices or not, "[i]t is clear that the Club affect[ed] the pricing through the fees it imposes on the entertainers for use of the [VIP dance booths and champagne rooms]." Degidio, 2015 WL 5834280, at *9. Such influence leans in favor of an employer-employee relationship. Id.

Gold Club "tightly control[led] the atmosphere of its business" and Schofield could only exercise creative freedom within this carefully curated environment. See Degidio, 2015 WL 5834280, at *12 (finding dancers to be employees at a club with "virtually no rules except for those mandated by state and local laws" because the club "tightly control[led] the atmosphere of its business"). Such control supports a finding that the "economic reality" of the relationship was that of an employer and employee. Id. The first factor therefore cuts in favor of economic dependence.

### B. **Opportunity for Profit or Loss**

The second factor is "the alleged employee's opportunity for profit or loss depending upon [her] managerial skill." Scantland, 721 F.3d at 1312. The focus in applying this factor "should remain on the worker's contribution to managerial decision-making and investment relative to the company's." McFeeley, 825 F.3d at 244.

Gold Club argues that the dancers exercised a significant degree of control over the opportunity for profit or loss. (Doc. # 56 at 14). Specifically, a dancer could determine when she showed up to work, how often she showed up to work, how long she performed, which customers she entertained, and what type of dances she offered. (Id.).

"This argument — that dancers can 'hustle' to increase their profits — has been almost universally rejected." Shaw, 241 F. Supp. 3d at 1325; see also Thompson v. Linda And A., Inc., 779 F. Supp. 2d 139, 149 (D.D.C. 2011); Harrell, 992 F. Supp. at 1352 (stating "[t]hat a dancer may increase her earnings by increased 'hustling' matters little" for determining opportunity for loss and/or profit). Instead, courts have routinely held that "where the clubs are primarily responsible for drawing customers to the club and set minimum fees for services, the clubs [] exercise significant control over the dancers' opportunity for profit." Reich v. Circle C. Invest., Inc., 998 F.2d 324 (5th Cir. 1993).

Most courts have found that the risk of loss is much greater for the club than for its entertainers. Clincy v. Galardi S. Enters., Inc., 808 F. Supp. 2d 1326, 1346 (N.D. Ga. 2011) (collecting cases); see also Reich v. Priba Corp., 890 F. Supp. 586, 593 (N.D. Tex. 1995) ("[E]ntertainers do not control the key determinants of profit and loss of a successful enterprise.").

This Court comes to the same conclusion. Gold Club controlled the flow of customers through advertising and branding (Doc. # 55-6 at 74:22-75:23), determined which customers were allowed to enter the club (Doc. # 55-5 at

22

35:13-17), and charged base rates for its VIP dances and champagne rooms. (Id. at 28:17-18, 42:1-25, 45:2-16; Doc. # 55-6 at 25:14-26:9, 62:9-18). In doing so, Gold Club "exercised significant control over the Dancers' opportunity for profit." Shaw, 241 F. Supp. 3d at 1326.

As far as the potential for losses, all overhead costs fell on Gold Club, including utilities, advertising, and the salaries of bartenders, VIP hosts, and kitchen staff. (Doc. # 55-5 at 61:6-62:16; Doc. # 55-6 at 83:7-84:5, 107:18-108:12, 67:3-9, 68:12-69:13). Dancers did not pitch in for these costs, nor were they consulted on managerial decisions such as how much to charge for food or drinks. (Doc. # 55-6 at 82:5-13, 107:18-22).

Indeed, the only risk of loss a dancer could incur was the nightly lease fee of $10 to $20, depending on when she arrived. (Doc. # 55-5 at 36:2-37:18). Gold Club's risk of profit and loss thus far exceeded that of Schofield and the other dancers, and the second factor weighs strongly in favor of finding an employer-employee relationship.

### C.   <u>Investment in Equipment or Materials</u>

The third factor in the economic reality test is "the alleged employee's investment in equipment or materials required for [her] task." Scantland, 721 F.3d at 1312. Gold

23

Club points out that employees generally do not invest their own money into their employers' business to generate profit, but here the dancers spent their own money on the outfits and accessories they needed to work. (Doc. # 56 at 15-16).

As with the second factor, the investment analysis focuses on the entertainer's investment relative to that of the club. McFeeley, 825 F.3d at 244. "[C]ourts which have addressed this factor have almost universally concluded that a dancer's investment is minor when compared to the club's investment." Harrell, 992 F. Supp. at 1350.

This case is no exception. Indeed, the facts of this case mirror Shaw, where the court held:

> Like employees in many fields, the Dancers were
> financially responsible for maintaining an
> appearance suitable to their work environment.
> Specifically, the Dancers invested in their hair,
> makeup, and costumes. In contrast, Defendants'
> investments included the club facilities, parking,
> stages, fixtures, décor, advertising and promotion,
> bartenders, waitresses, hostesses, security staff,
> music equipment, and general operating bills and
> expenses. Defendants' investments in the Clubs
> clearly and substantially outweighed the Dancers'
> investments. Thus, the third factor weighs in favor
> of the Dancers being employees.

241 F. Supp. 3d at 1326.

Like the dancer in Shaw, Schofield's investment was limited to her "costumes . . . makeup and shoes." (Doc. # 56 at 15-16). Gold Club's investment was far more significant,

encompassing virtually the same expenses as the club in Shaw. (Doc. # 55-5 at 61:6-62:16; Doc. # 55-6 at 83:7-84:5, 107:18-108:12, 67:3-9, 68:12-69:13). Therefore, this court comes to the same conclusion and finds that the third factor weighs heavily in favor of Schofield being an employee.

### D.   Special Skill

The fourth factor is "whether the service rendered requires a special skill." Scantland, 721 F.3d at 1312. Other courts have nearly all held that "there is no special skill required to be an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer." McFeeley, 47 F. Supp. 3d at 271-72 (citing cases); see also Clincy, 808 F.Supp.2d 1326, 1348 (N.D. Ga. 2011) (finding no special skill required even though club preferred prior experience and required dancers to audition). "Although different entertainers may possess varying degrees of skill, there is no indication that a high degree of skill or experience is necessary." Stevenson v. Great Am. Dream, Inc., No. 1:12-CV-3359-TWT, 2013 WL 6880921, at *5 (N.D. Ga. Dec. 31, 2013).

The Court agrees with this authority. Gold Club did not require dancers to have any kind of special skill that would bring them outside the FLSA's definition of an employee.

Although Gold Club asked about prior experience, it did not require dancers to have any formal training, certification, license, or experience. (Doc. # 55-6 at 80:5-12). For some women, Gold Club was the first club at which they ever worked. (Doc. # 55-5 at 62:24-63:1). Thus, the fourth factor weighs in favor of finding that the dancers are employees.

### E.   Permanency and Duration of Employment

Fifth, the Court considers "the degree of permanency and duration of the working relationship." Scantland, 721 F.3d at 1312. Schofield did not have a set schedule and was not required to provide advance notice of her selected shifts. (Doc. # 55-6 at 13:1-2, 60:14-15, 78:16-22). Nor was she punished if she left early or failed to come in and dance on a certain night. (Id. at 103:16-21). This factor therefore tips against a finding of employee status.

However, "courts have generally accorded this factor little weight in challenges brought by exotic dancers given the inherently 'itinerant' nature of their work." McFeeley, 825 F.3d at 244 (citations omitted); see also Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 921 (S.D.N.Y. 2013) (collecting cases).

**F.    Integral Part of Business**

The sixth and final factor is "the extent to which the service rendered is an integral part of the alleged employer's business." Scantland, 721 F.3d at 1312. Defendants argue that Schofield and the other dancers were not integral to their business because Gold Club's primary source of revenue was a cover charge, food, and alcohol. (Doc. # 56 at 17-18; Doc. # 55-6 at 98:1-20). Additionally, Defendants argue that Gold Club had other forms of entertainment such as pool tables and televisions showing sports. (Doc. # 55-6 at 33:5-22).

"Courts have uniformly characterized such arguments as 'simply unconvincing,' 'absurd,' and 'fl[ying] in the face of logic.'" Vaughan v. M–Entm't Props., LLC, No.14-CV-914-SCJ, 2016 WL 7365201 (N.D. Ga. Mar. 15, 2016) (internal citations omitted). "Without exotic dancers, the Clubs would be ordinary bars, not strip clubs." Shaw, 241 F. Supp. 3d at 1327. The sixth factor weighs heavily in favor of finding employee status.

**IV.    Conclusion**

Five of the six factors weigh in favor of concluding that Schofield and the other dancers were employees of Gold Club. "The only factor in [Gold Club's] favor — the permanence of the relationship — does not cut so strongly in that

27

direction as to come close to outweighing the other five."
Verma, 937 F.3d at 232.

The economic reality is that Schofield was entirely dependent on Gold Club for her economic opportunities, and Gold Club exerted significant control over Schofield while she was dancing. Therefore, the totality of the circumstances leads this Court to conclude that Schofield was an employee of Gold Club as defined by the FLSA.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Plaintiff Kristen Schofield's Motion for Partial Summary Judgment (Doc. # 55) is **GRANTED.**

(2)  The Court finds that, as a matter of law, Schofield was an employee of Gold Club within the meaning of the FLSA.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 12th day of February, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

28